

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1340-18

### CHRISTOPHER MIRANDA, Appellant

### v.

### THE STATE OF TEXAS

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE EIGHTH COURT OF APPEALS
### EL PASO COUNTY

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., RICHARDSON, NEWELL, KEEL, and MCCLURE, JJ., joined. YEARY, J., filed a concurring opinion in which SLAUGHTER, J., joined. WALKER, J., concurred.

### O P I N I O N

Appellant, Christopher Miranda, a high school gymnastics coach in El Paso, was accused of having improper relationships with three of his female students. He confessed to a school administrator to engaging in sexual intercourse with each student. This case involves one of those students and whether the *corpus delicti* of the offenses perpetrated against her has been shown by independent corroborating evidence. The court of appeals concluded that they had not, finding instead no evidence corroborating Appellant's

confession and that the closely-related-crimes exception to strict application of the *corpus delicti* rule did not apply. It rendered acquittals on some counts. We will reverse the lower court's judgment and reinstate Appellant's convictions.

## I. FACTS

In December 2011, Appellant was hired as a teacher at Eastwood High School in El Paso. Just over a year later, a teacher accused him of having an improper relationship with P.V., a 16-year-old girl. Bobbi Russell Garcia (Russell) was the Employee Relations Coordinator at the Yselta Independent School District (YISD), and she was responsible for investigating the allegation. She asked Appellant to meet with her at her office. Appellant verbally denied the allegation and gave a written statement. He wrote,

> These allegations of sexual relations with these students are completely false. My relationship with these students were coach or teacher -- student related. I did text them on occasion in accordance [to] the practices and gymnastics related issues. They did start gymnastics with me and they had continued to do so for some time. I know [P.V.] stopped coming to practice because she was having an issue with her best friend at the time. The best friend [] was pregnant and did not want to tell anyone about the issue. They thought about it and both stopped coming to gymnastics. [K.R.] was a soccer player who wanted to transfer to gymnastics. I allowed and started working with her until she stopped coming to practice due to gymnastics being more and more difficult. She was in the class for the 2012 spring semester. My relationship with [K.R.] had ceased in the summer (illegible) -- she had no interest in gymnastics. My relationship with [P.V.] had stopped in fall 2011 because she also too had stopped coming to gymnastics.

Even though Appellant was accused of having an improper relationship with only P.V., he wrote about another student, K.R. After he finished his statement, Russell told

Appellant that he was being placed on administrative leave, and Appellant left.

Over the next two days, Russell spoke to P.V., K.R., and other students before she met with Appellant a second time. When they met again, Appellant denied the allegations; this time in a recorded statement. Russell told Appellant that she had information confirming the allegation, and she said she would give him a few minutes to consider his story. Five minutes later, Appellant told Russell that "other things had also occurred." Russell began recording again, and Appellant admitted to having sex with P.V., K.R., and I.G. He had not been accused of having an improper relationship with I.G., and his admission was new and unsolicited. Russell then gave Appellant the option to resign or to have his contract terminated by the board of trustees, and she asked him to give another statement to ensure she "had all of the information on the students that could have potentially been affected." Appellant chose to resign and agreed to give another written statement. He wrote that,

> I, Christopher Miranda, had sexual relations with [P.V.]. I started out by a class land building [sic] that I did my first semester there. She was progressing quite fast and the connection was made. We exchanged numbers then eventually had sex. [K.R.] was the same scenario. [I.G.] was different. She was very (illegible) and we did go out a few times, but never had sex. [K.R.] had wanted to keep the relationship going, but I stopped it because I knew it was immoral. [P.V.] and I both agreed to stay because the circumstances of teacher/student. I know she was carrying the burden on her shoulders because she really wanted to continue the relationship. I have done few wrongs in my life, but these 3 are the worst things I've done. I can only ask forgiveness for anyone involved and anyone whose feelings were hurt in the process. I was starting this year smooth, and I wanted to make this a career. I'm ashamed of my actions and with this experience I will continue life with better judgment.

Russell noticed that Appellant denied having sex with I.G. in his written statement and said that they only had a "kissing relationship." Russell accepted his resignation after he finished writing his second statement, and Appellant left. She then reported the information to another member of the administration, who contacted the El Paso Police Department.

Detective Tanya Marie Rohwer with the El Paso Police Department conducted forensic interviews with I.G. and P.V., and Detective Olga Gomez conducted a forensic interview with K.R. Detective Rohwer testified that police obtained five arrest warrants after the forensic interviews were conducted. Three warrants were for improper student/teacher relationship and two for sexual assault against I.G. and K.R. Detective Rohwer said that they did not obtain an arrest warrant for sexual assault against P.V. because she was 17 years old when the allegations came to light and did not want to proceed with the charge. (There was no dispute that P.V. was 16 years old at the time of the assault.)

I.G.'s father testified at trial. He said that his daughter, who went by the nickname "Belly," left him a book to read with a letter in it from Appellant. It was dated September 9, 2012. Appellant wrote that,

> Dear Most Gracious & Precious Belly,
>
> I know how sad you are about homecoming and all, but I feel as if there is nothing I can do to make you happy. I do have an idea which will be at the end of this letter.

First off, I want to let you know that I'm super happy with you and can't believe what we are doing. Most people would think that finding love between a teacher and a student should be forbidden. I would not have it any other way, though. I really do feel that I can spend the rest of my life with you. We have about 20 more months before we can start doing fun stuff. I hope we do because going out will be a million times easier, and I would be able to do cute things for you like the ones you have been witnessing. I really like the way this pen writes. It's one I got from Austin. I really wanted to get you one that had your name but it wasn't there. Sunday??

So our sixth month anniversary is coming up soon. And I don't know what to do since we've pretty much done everything we can already. I'm going to need some ideas from you. Anything on this?

---

So without further ado, here is my proposition from [sic] you:
   Would you, [I.G.], like to accompany me at the 2012/2013 EHS homecoming?
   ☐ Yes*
   ☐ No

---

Sincerely, with lots of love,
Christopher Miranda, Dorney.[1]

*If you agree, note that this is only a cordial invitation and any obligation, slash, duties a normal person would do for this situation is null and void based on the decision of the inviter.*

K.R. also testified. She said that her family moved to El Paso in April 2011 and that she played soccer until the end of her sophomore year when she and a friend switched to gymnastics. She was 16 years old when she met Appellant. According to K.R., she and Appellant began talking outside of school when he texted her one night.

---

[1]"Dorney" was one of Appellant's nickname at school. He was also known as "Coach Sensei."

She did not know how Appellant got her phone number. The assault happened after they had been texting for a few weeks.

The night of the incident, Appellant texted K.R. and invited her to hang out with him at his parent's house, where he lived. She agreed and snuck out of her parent's house at about midnight, and Appellant picked her up. Once they got back to his parent's house and went inside, K.R. noticed that it was dark, and she said that he told her to be quiet. K.R. realized that she should not have been with Appellant at his house "as soon as I entered and walked up the stairs [to his room] and realized nobody -- it didn't seem like anyone was home and then I was told to be quiet, I felt uncomfortable." They hung out in his room for a bit. He played video games while she was on Facebook. Eventually, Appellant turned off the video game and started talking to K.R. During the conversation, he took her phone and set it aside, then began moving closer to her. K.R. kept scooting away until she reached the wall and had nowhere else to go. While Appellant was cornering her, she said that she nervously joked with him about how she needed more space, but Appellant started to kiss her face. He then lifted her up and set her down in the middle of the bed and started to take off her clothes. She did not resist because Appellant was so much bigger. Appellant then took off his shorts, crawled on top of K.R., and had vaginal intercourse with her. After they had sex, they continued to hang out in his room. K.R. said that she did not leave because she was afraid to walk home in El Paso at night, especially because she lived a couple of miles away. Appellant finally drove her home

around 3 or 4 a.m. When she was getting out of his car, he told her to "stop acting weird."

K.R. said that she did not report the crime or tell her parents about what happened for about a year because she was ashamed. She also said that her family moved a lot because her father was in the military, but she had friends at Eastwood that she liked, and she was getting ready to go to prom and graduate. She thought that she might not be allowed to graduate from Eastwood if she turned him in. She also knew that her friends, who were very close to Appellant, would be upset.

When Russell learned from Appellant's statement that K.R. might also have been involved, she called K.R.'s parents, then met with K.R., who denied everything.[2] But she told her father the truth when she arrived home from school. She said that she only admitted what happened because Appellant confessed. K.R.'s fears about what might happen were also realized. Students close to Appellant began threatening "the student" who accused Appellant. (K.R.'s identity was not public knowledge, but she was afraid that it would become public knowledge.) She subsequently transferred to and graduated from Plato Academy. She said that graduating from Plato was "shameful," and she thought that it affected her college applications because many students go there because they cannot meet academic standards.

P.V. and I.G. did not testify.

## II. PROCEDURAL HISTORY

---

[2]K.R. was upset that Russell was questioning her without her parents present.

Appellant was indicted for various crimes related to his conduct:

- Count I: Improper relationship by engaging in sexual intercourse with "Jane Doe" [P.V.] on or about September 1, 2011.

- Count II: Improper relationship by engaging in sexual intercourse with "Jane Doe" [I.G.] on or about October 1, 2012.

- Count III: Improper relationship by engaging in sexual intercourse with "Jane Doe" [K.R.] on or about April 1, 2012.

- Count IV: Sexual assault of a child by causing penetration of the sexual organ of I.G. by means of the sexual organ of the defendant on or about October 1, 2012.

- Count V: Sexual assault of a child by penetration of the sexual organ of K.R. by means of the sexual organ of the defendant on or about April 1, 2012.

- Count VI:  Sexual performance by a child by inducing I.G. to engage in sexual intercourse on or about October 1, 2012.

- Count VII: Sexual performance by a child by inducing P.V. to engage in sexual intercourse on or about September 1, 2011.

- Count VIII: Sexual performance by a child by inducing K.R. to engage ins sexual intercourse on or about April 1, 2012.

The jury found Appellant guilty of Counts I, III, V, and VII, which dealt with P.V. and K.R. It acquitted him of Counts II, IV, and VI, which dealt with I.G., and it also acquitted him of Count VIII for sexual performance of a child by K.R. The jury sentenced Appellant to terms of confinement of 10 and 4 years for his improper relationships with P.V. and K.R., 2 years for inducing P.V. to engage in a sexual performance, and 10 years for his sexual assault of K.R. The judge ordered the sentences to run concurrently.

### III. COURT OF APPEALS

Appellant argued on appeal that his statements to Russell, a school administrator, were inadmissible because they were the product of an unwarned custodial interrogation. He also argued that the trial court should have given a voluntariness instruction and that the evidence was legally insufficient. The court overruled all points of error except the sufficiency point.[3] It affirmed Appellant's convictions on Counts III and V (K.R.) because the *corpus delicti* of those offenses had been shown, but it rendered acquittals on Counts I and VII (P.V.), finding that the *corpus delicti* of those offenses had not been shown. It reasoned that, while K.R. testified, P.V. did not, and there was no other evidence corroborating Appellant's confession. It further concluded that the closely-related-crimes exception did not apply because Appellant's offenses took place over too long a time. *Miranda*, 2018 WL 5862160, at *7 (quoting *Miller v. State*, 457 S.W.3d 919 (Tex. Crim. App. 2015)). The exception, it noted, had been applied only once by this Court and to offenses that took place over a 27-day period, but Appellant's crimes spanned just over a year.

### IV. ARGUMENTS OF THE PARTIES

The parties' arguments are simple: Appellant argues that the court of appeals was correct that the closely-related-crimes exception does not apply and that *Miller* is distinguishable. The State argues that the court of appeals erred and that the closely-

---

[3]Appellant did not refer in his brief specifically to the *corpus delicti* doctrine, but he did discuss the necessity of corroborating an extrajudicial confession.

related-crimes exception should apply. It acknowledges that these facts are distinguishable from *Miller* but says that this Court should extend the exception to cover the facts of this case. According to the State, the offenses are closely related in character and all occurred during a single course of conduct, and it concludes that the key consideration is whether application of the exception would violate the policy underlying the *corpus delicti* rule, asserting that it would not here.

## V. *CORPUS DELICTI* RULE

### a. Background

The *corpus delicti* rule is a common law rule of evidentiary sufficiency that applies to convictions based on extrajudicial confessions. *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002). When a conviction is based on a defendant's extrajudicial confession, that confession does not constitute legally sufficient evidence of guilt without corroborating evidence independent of that confession showing that the "essential nature" of the offense was committed. *Miller*, 457 S.W.3d at 924. The corroborating evidence need not prove that the crime was committed; it "need only make this conclusion more probable." *Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997). We consider all the admitted evidence except the extrajudicial confession and view it in the light most favorable to the verdict. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993).

### b. *Miller*—Closely Related Crimes Exception

In *Miller*, we recognized an exception to strict application of the *corpus delicti* rule

when a defendant is charged with multiple, closely-related offenses, but the *corpus delicti* of only some of the offenses is shown. *Id.* at 927. The appellant in *Miller* confessed to police that he engaged in sexual conduct with his then three-month-old daughter. *Id.* at 920. He admitted to molesting his daughter at least three different times, including once in her nursery and twice in his bedroom. *Id.* Later, the appellant confessed to police that he remembered a fourth time when he took a picture of his penis on his daughter's vagina, but he said that he deleted the picture, which police later confirmed. *Id.* Police were able to corroborate only one of the incidents. *Id.* at 920–21. They found his semen in carpet near his daughter's changing table where he said it would be after he masturbated and ejaculated. *Id.* The crimes took place over a 27-day period. *Id.* at 920. The jury convicted the appellant of all four counts and sentenced him to life imprisonment for each offense. *Id.* at 921.

The issue was whether this Court should adopt the closely-related-crimes exception and apply it. *Id.* Analysis began with an examination of cases from other jurisdictions,

> In Indiana, . . . when a suspect confesses to multiple criminal offenses from a single criminal episode or course of conduct, the corpus delicti rule is satisfied if the prosecution can sufficiently corroborate the most serious offense. In Pennsylvania, the rule is satisfied if one of the related offenses to which the suspect confessed is corroborated.

*Id.* at 925. We also cited to courts of appeals in other states. *Id.* at 927. The crimes in those cases took place over varying lengths of time, but the courts stressed that

application of the exception was decided on a case-by-case basis, and many of them spoke about commonalities between the crimes and the nature of the offenses. *Id.* at 926. We also noted the Colorado Supreme Court's concern that strict application could frustrate convictions in cases involving "the most vulnerable victims, such as infants, young children, and the mentally infirm . . . ." *Id.* at 927 (citing *Colorado v. LaRosa*, 293 P.3d 567, 574 (Colo. 2013)).

## VI. ANALYSIS

We cannot fault the court of appeals for concluding that the closely-related-crimes exception did not apply based on *Miller*. However, we decided that case based on its facts, and whether the exception to strict application of the rule applies is a fact-specific one. This case presents different facts, but we nonetheless conclude that the closely-related-crimes exception applies.

In *Miller*, although we noted that the offenses were identical, committed against the same victim, and that they took place during a course of conduct, we chiefly focused on the temporal relationship between the crimes. We now take the opportunity to clarify that the temporal proximity of the offenses is not dispositive of whether the closely-related-crimes exception applies. The *sine qua non* of the inquiry is whether the relationship between the crimes is sufficiently "close" to "avoid admitting a confession for a crime that did not occur . . . ." *Pennsylvania v. Taylor*, 831 A.2d 587, 594 (Pa. 2003). This makes sense because it reflects our recognition that the purpose of the *corpus*

*delicti* doctrine is to protect people who would confess to imaginary crimes. It also aligns with the fact that application of the exception is determined on a case-by-case basis. The "closeness" of offenses should be determined by examining not only the temporal proximity of the offenses but also the type of offenses, similarities in how the offenses were committed, whether the offense arose from a single criminal episode or a course of conduct, whether the *corpus delicti* of other offenses have been shown, and any other consideration that would logically inform the inquiry.

According to the court of appeals, the only corroborating evidence that Appellant committed the alleged crimes was the letter from Appellant to I.G., which at most showed an improper relationship between Appellant and I.G., and K.R.'s testimony that Appellant had an improper relationship with her and sexually assaulted her. *Miranda*, 2018 WL 5862160, at *7. We think there is more corroborating evidence. Detective Rohwer testified that I.G. alleged during her forensic interview that Appellant engaged in improper sexual contact with her. According to Detective Rohwer, despite the allegation and her belief that police could obtain an arrest warrant for sexual assault, they decided not to because, although I.G. was 16 years old at the time of the assault, she was 17 years old at the time of the interview and did not want to proceed with the charge. Appellant also admitted to engaging in sexual intercourse with I.G.[4]

---

[4]Although the jury acquitted Appellant of the alleged offenses committed against I.G., we consider all the admitted evidence to determine if the *corpus delicti* of an offense has been shown. *Fisher*, 851 S.W.2d at 303. We also note that the evidence necessary to establish the *corpus delicti* of an offense is much less than what is legally sufficient to support a criminal

Independent of Appellant's confession regarding P.V., the evidence shows that he engaged in a course of conduct, grooming his underage female students, I.G. and K.R. Using his position of authority as a teacher and a coach, he convinced them to participate in a romantic relationship, then engaged in sexual intercourse with them. He used the same tactics with both students. Given the identical nature of all the sexual offenses, the strikingly similar *modus operandi* for each offense, and the fact that the *corpus delicti* of many of the crimes were shown, we are satisfied that the offenses are sufficiently closely related to alleviate any concern that the crimes against P.V. were never committed. Appellant's confession has been corroborated and the *corpus delicti* rule satisfied.

## VII. CONCLUSION

Because we conclude that the closely-related-crimes exception applies, we reverse the judgment of the court of appeals rendering acquittals on Counts I and VII and reinstate the trial court's judgments of conviction.

Delivered: April 21, 2021

Publish

---

conviction. *Compare Williams v. State*, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997), *with Jackson v. Virginia*, 443 U.S. 307 (1979).